See also, D.C., 123 F.R.D. 333.

Kenneth GUENTHER, George Robinette, Andrew H. Swartz, and Charles P. Stetson, Jr., suing individually and as shareholders of American Network, Inc., on behalf of themselves and other shareholders of American Network, Inc., similarly situated in and in the right of American Network, Inc., Plaintiffs,

v.

PACIFIC TELECOM, INC., a Washington corporation, E.B. Galligan, A.M. Gleason, Anthony J. Bosboom, John H. Geiger, Eric H. Randolph, Karl D. Wetzel, C.M. Binkley, Wallace F. Burnett, Dennis W. Egan, Joyce E. Galleher, Russell A. Hartman, William L. Hensley, Donald L. Mellish, Charles E. Robinson, Robert A. Sneddon, Sidney R. Snyder, A.W. Sweet, Price Waterhouse, a partnership, Donald Irving and American Network, Inc., an Oregon corporation, Defendants.

Civ. No. 86–1650 MA.

United States District Court, D. Oregon.

Aug. 14, 1987.

On Motions to Dismiss Oct. 11, 1988.

David B. Markowitz, Peter H. Glade, Markowitz, Herbold, Stafford & Glade, P.C., Portland, Or., for plaintiffs Guenther, Robinette and Swartz.

Paul Gary, Hanna, Urbigkeit, Jensen & Holloway, Portland, Or., for plaintiffs.

Barnes H. Ellis, Stephen L. Griffith, Stoel, Rives, Boley, Jones & Grey, Portland, Or., for defendants Pacific Telecom, Inc. and PTI Directors.

Thomas A. Balmer, Mark A. Turner, Dan Skerrit, Lindsay Hart, Neil & Weigler, Portland, Or., for defendants Galligan, Bosboom, Randolph, Wetzel.

Douglas M. Ragen, Julie R. Vacura, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., for defendants Irving and Price Waterhouse.

Deborah Johnson Harwood, In House Counsel, American Network, Vancouver, Wash., Frank H. Lagesen, Thomas W. Brown, Cosgrave, Kester, Crowe, Gidley & Lagesen, Portland, Or., for defendant American Network.

## OPINION

MARSH, District Judge.

This is a derivative and class action originally brought by Plaintiff Stetson, individually and on behalf of similarly situated shareholders of American Network, Inc. (AmNet), against Pacific Telecom, Inc. (PTI) and its directors; Price Waterhouse & Co., Inc., and its accountant Donald Irving; and AmNet and its directors.[1] Jurisdiction is exercised pursuant to 15 U.S.C. § 77v and 28 U.S.C. § 1331. Defendants move pursuant to Fed.R.Civ.P. 23.1 to dismiss the complaint insofar as it includes Stetson as a derivative plaintiff. Defendants contend that Stetson lacks standing as a warrantholder or shareholder of AmNet to bring a derivative suit and that he fails to meet the fitness requirements set forth in Fed.R.Civ.P. 23.1[2] Defendants also object to counsel for plaintiffs continuing to represent the plaintiffs due to a conflict of interest which prevents them from naming

---

1. The Second Amended Complaint includes the class action claims which are not addressed by defendants 23.1 motions. Nevertheless, when considering whether Stetson and counsel adequately represent similarly situated shareholders, I am mindful of the fact that this issue will also impact the certification of the class action.

2. Since the filing of defendants' motions, the second amended complaint has been filed adding three additional derivative plaintiffs. Nevertheless, the motions are still pertinent to the fitness of Stetson as a representative of similarly situated shareholders of AmNet in light of the fact that he has been the dominant plaintiff.

an AmNet and PTI director as a defendant. In order to properly determine defendants' motions, the rather complex facts leading up to this derivative suit must be examined.[3]

## FACTUAL BACKGROUND

In January, 1983, Stetson's employer, Davis Skaggs & Co., Inc. (DSI), was involved in obtaining $500,000 of equity capital for SaveNet. In partial compensation for this work, DSI received a warrant to purchase 25,000 shares of SaveNet common stock. In March, 1983, this warrant was reissued in smaller amounts to DSI employees. Stetson received a warrant for 300 shares.

In July, 1984, negotiations began regarding a possible investment in SaveNet by CP National Corporation (CPN). In September, 1984, CPN offered to make an equity investment in SaveNet. This offer was stated in an "Agreement in Principle" and accepted by SaveNet. During that same month, discussions began concerning a proposed investment in SaveNet by PTI and AmNet.[4] On September 24, 1984, John S. Loewen, President and Chief Executive Officer of SaveNet, requested that Stetson provide an opinion at the next SaveNet board meeting as to the fairness of the "Agreement in Principle" proposed by CPN. This request was made again in writing on September 25, 1984. In that writing, Loewen stated that SaveNet would pay Stetson a fee of 4% of the gross proceeds if the investment by CPN was actually made.

On October 5, 1984, the controlling shareholders of SaveNet voted for a merger with AmNet. Thereafter, Stetson began contacting officers of SaveNet, CPN, and AmNet concerning the payment of his investment banking fee. He contended that he was entitled to this fee because he was responsible for bringing SaveNet and CPN

officials together. The fact that SaveNet had not actually merged with CPN was irrelevant, in his view, since he had caused the AmNet investment by creating a favorable investment climate through the procurement of the proposed investment by CPN. On November 21, 1984, AmNet and SaveNet signed an Agreement and Plan of Merger which provided that on the effective date of the merger, warrants for SaveNet stock would be converted into warrants for AmNet stock. Stetson continued his personal attempts to collect his fee through January 14, 1985. On January 15, 1985, Stetson purchased five shares of AmNet stock for $22.50. On March 20, 1985, the merger became effective.

On May 1, 1985, Stetson filed a complaint against SaveNet, AmNet and certain individuals. The complaint alleged that he was entitled to the investment fee under the September 25, 1984 agreement with SaveNet. An amended complaint was filed on February 12, 1986, adding PTI as a defendant. The amended complaint was superseded by a pretrial order in which Stetson demanded that the defendants pay him $2.8 million in compensatory damages and $5 million in punitives. On February 6, 1986, the case was dismissed on the defendants' motion for summary judgment. The case is currently on appeal.

On December 6, 1986, Stetson's attorney notified AmNet that grounds existed for a derivative suit concerning certain transactions between AmNet and PTI. On December 11, 1986, Stetson's attorney sent to AmNet a draft complaint alleging breach of fiduciary duty. The complaint was filed on December 24, 1986. An Amended complaint was filed on January 19, 1987.

In June, 1987, a second amended complaint was filed adding three derivative plaintiffs and the class action claims. The complaint alleges eleven derivative and eight class action claims. The claims arise

---

**3.** The factual background set forth in this opinion is taken from two sources: The "Agreed Facts as to Which Relevance is not Disputed" section of the pretrial order in *Stetson v. SaveNet, et al.,* Civil No. 85–1764–DA ("Stetson I") and facts set forth in Defendants' Rule 23.1 motions

in the present action which Stetson has not disputed.

**4.** In March, 1984, PTI purchased the voting rights to 51% of the shares of AmNet which explains the reason for these two corporations acting in conjunction with one another.

from the allegation that "each of the defendants participated, aided and abetted, and/or conspired to participate in a scheme to intentionally defraud AmNet through a series of acts that greatly reduced AmNet's net worth and diluted the shares held by the class of minority public shareholders." Plaintiffs contend that large blocks of AmNet stock were issued to PTI and CP National Corporation (CPN) for consideration substantially less than its fair market value.

## STANDARDS

The question of a stockholder's right to sue on behalf of the corporation is an equitable one, and no jury trial is required to determine the question. *Lewis v. Anderson,* 615 F.2d 778, 784 (9th Cir.1979) *cert. denied* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980). The burden is on the defendants to show that Stetson is an inadequate representative. *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 592 n. 15 (5th Cir.) *cert. denied* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974); 7C C. Wright & A. Miller, Federal Practice and Procedure § 1833 (1986).

In deciding whether Stetson is a proper representative in this derivative suit, I am guided by Fed.R.Civ.P. 23.1, which provides in part that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders ... similarly situated in enforcing the right of the corporation." The underlying purpose of rule 23.1 is to prevent what is known as "strike suits." This was explained by the Supreme Court in *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 548, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949):

> Equity came to the relief of the stockholder, who had no standing to bring civil action at law against faithless directors and managers.... Unfortunately, the

remedy itself provided opportunity for abuse, which was not neglected. Suits sometimes were brought not to redress real wrongs, but to realize upon their nuisance value. They were bought off by secret settlements in which any wrongs to the general body of share owners were compounded by the suing stockholder, who was mollified by payment from corporate assets. These litigations were aptly characterized in professional slang as "strike suits."

The *Cohen* Court went on to describe the representative plaintiff in a derivative suit as assuming the position of a fiduciary in the sense that he is suing not on behalf of himself but as a representative of all who are similarly situated. The Court stressed that "the interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity." 337 U.S. at 549, 69 S.Ct. at 1227.

The importance of determining adequate representation cannot be understated. The rule that the representative must fairly and adequately represent the class is one of constitutional magnitude. This is due to the binding effect of derivative and class actions on absent class members:

> The binding effect of all class action decrees raises substantial due process questions that are directly relevant to Rule 23(a)(4). If the absent members are to be conclusively bound by the result of an action prosecuted or defended by a party alleged to represent their interests, basic notions of fairness and justice demand that the representation they receive be adequate....

7A C. Wright & A. Miller, Federal Practice and Procedure § 1765 (1986).[5] Thus, unless there has been fair and adequate representation, the process due absent members will not be satisfied.

*See Smith v. Schweiker,* 671 F.2d 789 (3rd Cir. 1982). *See also* 7C C. Wright & A. Miller, Federal Practice and Procedure, § 1833 (1986) (Many factors involved in the decision to certify a class under Fed.R.Civ.P. 23 apply in the context of a derivative suit.)

---

5. Although the quoted material concerns Fed.R.Civ.P. 23 on class actions, as opposed to Fed.R.Civ.P. 23.1 on derivative actions, both rules use identical language as to the requirement of adequate representation. Consequently, it is well established that the analysis applied in class actions is equally applicable to derivative cases.

## DISCUSSION

Defendants object to Stetson as a derivative plaintiff in this action for several reasons. First, they contend that Stetson was a mere warrantholder as opposed to a stockholder at the time of the alleged wrongful transaction. Second, they contend that Stetson owned neither stock nor warrants in AmNet at the time the alleged wrongful transaction occurred. Consequently, they argue that the requirement of Fed.R.Civ.P. 23.1 that the "plaintiff [be] a shareholder ... at the time of the transaction of which the plaintiff complains" is not satisfied.

I agree with defendants that it is unlikely that Stetson has standing as a shareholder of AmNet to bring a derivative suit by virtue of his warrants in SaveNet or AmNet or by virtue of his purchase of five shares of AmNet stock after the shareholder vote to accept the merger.[6] Nevertheless, I need not analyze whether Stetson is qualified as a "shareholder" as my decision to dismiss him as a plaintiff is based on the conclusion that he is not a fair and adequate representative of similarly situated shareholders. It is for this reason, as set forth hereafter, that I hold that Stetson may not bring a derivative action on behalf of shareholders of AmNet.

■ In determining the adequacy of representation under rule 23.1, it is well established that courts can and should consider "outside entanglements making it likely that the interests of the other stockholders will be disregarded in the management of the suit." *See G.A. Enterprises, Inc. v. Leisure Living Communities, Inc.,* 517 F.2d 24, 27 (1st Cir.1975). *See also Davis v. Comed Inc.,* 619 F.2d 588 (6th Cir.1980); *Blum v. Morgan Guaranty Trust Co.,* 539 F.2d 1388 (5th Cir.1976). Courts confronted with the issue of outside entanglements, such as ongoing litigation between a plaintiff and the defendant corporation, consider the extent, character and potential conflict of the claims. Thus, in *G.A. Enterprises,* the court considered the relative value of the subject matters involved in the various claims. In so doing, the court stated:

> [Plaintiff] values its claim on behalf of [the corporation] in the neighborhood of $2,000,000. Even if the corporation's claim were assumed to be worth, unrealistically, its face value, its value to a holder of less than 1% of the company's stock would be relatively small, far less than the amounts at stake in [plaintiff's personal cases.] In these circumstances, the court could conclude that the dog might soon wag the tail.
>
> [Plaintiff's] own interests ... suggest that from its standpoint the "highest and best" use of the derivative suit would be as a weapon in the total ... arsenal, to be either pursued, de-emphasized, or settled as the future course of the larger claims might dictate.[7]

517 F.2d at 26.

■ Similarly, Stetson's personal litigation against PTI and AmNet involves a demand for $7.8 million. The worth of the derivative suit to Stetson, as a holder of 5 shares of AmNet stock has been estimated at $20.[8] Consequently, plaintiff's own interests would be to use this derivative suit as leverage in negotiating a settlement of his investment banking fee claim. Although I recognize that Stetson would be unable to settle the derivative action without court approval, I agree with the court in *G.A. Enterprises* that such approval is not sufficient protection in the case of such a conflict in light of the complexity of the issues and the many other duties of the court. *See* 517 F.2d at 27.

---

6. As discussed *infra,* my concern as to Stetson's purchase of five shares of AmNet stock is not directed at the amount of shares purchased but rather to the timing of the purchase.

7. The *G.A. Enterprises* Court recognized that a derivative suit cannot be settled without court approval but noted that a court's ability to oversee complex litigation is necessarily limited in light of its many other duties. Thus, the court concluded that in an adversary system, a court must rely largely on the parties. 517 F.2d at 27.

8. This figure does not include the punitive damages requested in the Second Amended Complaint. My conclusion as to the effect of the relative worth of the claims, however, would be unaffected by the inclusion of punitives.

I am also concerned with Stetson's motive in purchasing five shares of AmNet stock in January, 1985. Not only is this a small amount of stock to be purchased for investment purposes as Stetson proposes, but it was purchased at a time when Stetson had an ongoing conflict with AmNet over his investment fee. Although I cannot conclusively conclude that this purchase was not made as an investment, I nevertheless consider the timing of the purchase when evaluating Stetson's fitness as a derivative plaintiff and the importance of his outside entanglements. *See Blum*, 539 F.2d at 1390.

I conclude that Stetson's conflict of interest created by his private cause of action is sufficient to disqualify Stetson as an adequate representative under Fed.R.Civ.P. 23.1. Because additional plaintiffs have been named in the Second Amended Complaint, however, this finding does not warrant the dismissal of the derivative action itself.

## ADEQUACY OF DERIVATIVE PLAINTIFFS' ATTORNEYS

During the course of defendants' rule 23.1 motions, it has come to the court's attention that notwithstanding Stetson's own conflict of interest caused by his private cause of action, plaintiffs' attorneys themselves have a conflict. This conflict is evident from the pleadings in this case. The facts involved are undisputed.

As noted above, on December 11, 1986, Stetson's attorney sent to AmNet a draft complaint for the derivative action. The defendants named in the draft complaint included AmNet and its 1984 directors. This included Louis B. Perry, a member of the AmNet board of directors since 1983 and a member of PTI's board of directors since 1985. The complaint was filed on December 24, 1986. An amended complaint was filed on January 19, 1987, wherein Perry was omitted as a defendant. There was no motion filed to dismiss Perry nor was there any type of settlement negotiated. Plaintiffs' attorneys acknowledge that Perry was dropped from the case because he was a client of their firm. They

further acknowledge that if he had not been a client, he would have been included as a defendant.

In determining the adequacy of representation by plaintiffs in a derivative suit, I may consider both the interests of derivative plaintiffs and the competence of their legal counsel. *Social Services Union, Local 535 v. County of Santa Clara,* 609 F.2d 944, 947 (9th Cir.1979). In *County of Santa Clara,* the court specifically noted that in order for plaintiffs to fairly and adequately represent a class, it must be demonstrated that their attorneys are "qualified, experienced and generally able to conduct the litigation." 609 F.2d at 947. If in maintaining the action plaintiffs' counsel should be disqualified because of a conflict of interest, they certainly are not "generally able to conduct the litigation." *In re Fine Paper Antitrust Litigation,* 617 F.2d 22, 27 (3rd Cir.1980) (*citing North American Acceptance v. Arnall, Golden & Gregory,* 593 F.2d 642, 644 (5th Cir.) *cert. denied* 444 U.S. 956, 100 S.Ct. 436, 62 L.Ed.2d 328 (1979). That is the case here.

It would be in the shareholders' best interest to name any and all directors potentially liable in this action. Although plaintiffs' attorneys are correct in pointing out that not all potentially liable directors need to be named because there is joint and several liability, their reason for failing to name Perry as a codefendant is not a tactical choice made in the best interests of the corporation and its shareholders but rather a necessary choice in light of the conflict of interests caused by their representation of Perry in other matters. In this respect, the circumstances of this case are similar to those in *Schmidt v. Magnetic Head Corp.,* 101 A.D.2d 268, 476 N.Y.S.2d 151 (1984). In *Schmidt,* although many more conflicts were involved, the court spoke to the fact that a cross-claim had not been brought by the defendant corporation against an individual director presumably because the attorneys involved represented both the defendant corporation and the individual director. The court concluded that disqualification of the attorneys was appropriate due to the "clear potential conflict between the

interests of the corporations and those of the individual defendants." Here too, I feel I am compelled to exercise my discretion in favor of disqualifying plaintiffs' present attorneys from representing the remaining plaintiffs. Contrary to the attorneys' contention, their conflict of interest cannot be "cured by adequate disclosure and consent." Although the derivative plaintiffs may be adequately informed of counsels' conflict and consent to representation, not all similarly situated shareholders have been given this opportunity. Similarly, not all shareholders would necessarily have the same confidence in plaintiffs' attorneys' decision not to name Perry as a defendant.

■ Moreover, counsels' suggestion that all similarly situated shareholders could be notified of their potential conflict does not ensure adequacy of representation. Even if counsel could accomplish the formidable task of notifying all similarly situated shareholders and receive consent, that fact would not relieve this court of its obligation under Fed.R.Civ.P. 23.1 to determine the adequacy of representation. In this respect, derivative suits are different from class actions in that the shareholders do not have an opportunity to opt out of the class and have their day in court in a separate action.[9] In a derivative suit, the cause of action is in behalf of the corporation. Once adjudicated, other shareholders would be precluded by *res judicata* from relitigating the same issues against the same corporations and directors in a second derivative suit.[10]

Because disclosure and consent does not resolve the issue of adequacy of representation, counsels' reliance on *In re Johnson*, 300 Or. 52, 707 P.2d 573 (1985) is misplaced. In that case, the Oregon Supreme Court set forth three categories of attorney conflicts: actual, potential and unlikely. Plaintiffs' counsel argue that its conflict is "unlikely" and that under *In re Johnson*, they need not even disclose such a conflict. Counsel misses the point. Whatever the "category" of conflict involved here, the fact remains that it is due to this conflict that they have not vigorously and tenaciously protected the interests of the shareholders by naming all potentially liable directors as defendants.

Similarly, counsels' assertion that *Melamed v. ITT Continental Baking Co.*, 592 F.2d 290 (6th Cir.1979) is "directly on point to the situation here" is unconvincing. *Melamed* is an antitrust case where defendant Continental filed a motion to disqualify the plaintiff's counsel on the basis that the attorneys also represented two large baking companies which, like Continental, had been competitors of plaintiff. The court refused to disqualify plaintiff's counsel primarily on the basis that the conflict had been fully disclosed to plaintiff and that plaintiff, who was the only party who could be "conceivably harmed by the potential conflict" desired to keep its counsel. 592 F.2d at 294. That holding is inapplicable to this case for two reasons. First, *Melamed* was not a derivative suit. Thus, the issue of whether disclosure and consent by representative plaintiff is sufficient to protect the interests of absent shareholders was not addressed. Second, the attorneys subject to disqualification in *Melamed* testified that they conducted an investigation into the possibility of filing an antitrust action against plaintiff's competitors and found that the only party which plaintiff had a claim against was Continental. 592 F.2d at 294. Thus, I do not find *Melamed* helpful or "on point" to the situation involved here.

Finally, it is asserted that both continued standing of Stetson and representation by

---

**9.** This is not to say that the ability to opt out of a class action lessens the necessity of adequate representation. In many cases the opposite would be true in light of the fact that an adjudication of a class action precludes absent members from enforcing any *individual* rights against the corporation which were the subject of the class litigation.

**10.** A dismissal on the basis of inadequate representation, on the other hand, is not a dismissal on the merits and does not preclude a further cause of action. Similarly, the judgment in a derivative suit will not preclude any right of action that an absent shareholder might have in his or her *individual* capacity. 7C C. Wright & A. Miller, Federal Practice and Procedure § 1840.

his attorneys be allowed because of the effort hence far expended and the necessity of new plaintiffs or attorneys to become familiar with the case. These are matters which have been evident for months and could have been cured voluntarily. It is my responsibility to assure adequate, vigorous, and consistently focused representation and advocacy on behalf of both named and unnamed plaintiffs, stockholders and perhaps ultimately other potential class members. To do so requires plaintiffs with a single purpose unfettered by personal interests which are antagonistic to the interests he represents. Further, it requires counsel free to be dedicated advocates without compromising what would be their normal tactics because of an impending conflict. If the conflict is avoided by not including an appropriate defendant, then the conflict exists the other way by not being the complete advocate.

Plaintiff Stetson is disqualified from acting further as plaintiff in the derivative suit and plaintiffs' attorneys Paul Gary and Hanna, Urbigkeit, Jensen, et al., are disqualified from acting as plaintiffs' attorneys in this matter as a whole.

Defendants are to prepare a proposed form of order, submit it to counsel for plaintiffs and, if agreed upon as to form, present it to the court. Such order should further provide that plaintiffs have 30 days from the date of the order within which to obtain substitute counsel. In the interim, all discovery, conferences and currently scheduled matters are held in abeyance. The preliminary injunction now scheduled for September 1, 1987, is removed from the calendar to be reset with all other matters upon the appearance of new counsel.

## ON MOTIONS TO DISMISS

Plaintiffs, former minority shareholders of American Network, Inc. (AmNet), originally brought this action asserting direct and derivative claims against Pacific Telecom, Inc. (PTI) and its directors; Price Waterhouse & Co., Inc., and its accountant Donald Irving; and AmNet and its directors. Since the filing of this action, AmNet and United States Transmissions Systems, Inc. (USTS), have entered into an Agreement and Plan of Exchange. The result of this Exchange Agreement was to automatically exchange all of plaintiffs' shares of AmNet for the right to receive $.25 in cash without interest.

Defendants now seek to dismiss plaintiffs' derivative claims on the basis that plaintiffs are no longer shareholders of AmNet. Plaintiffs oppose the motion and seek to assert their claim for breach of fiduciary duty directly. For the reasons set forth below, defendants' motions to dismiss are granted.

## DISCUSSION

■ It is well established that Fed.R.Civ. P. 23.1 implies that plaintiffs asserting a derivative claim must be shareholders at the time of the alleged wrong and must retain ownership for the duration of the lawsuit. *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir.1983). Consequently, plaintiffs only viable argument in opposition to defendants' motions to dismiss is that they should be allowed to bring their claim for breach of fiduciary duty directly.

The proper resolution of this issue depends upon the interpretation of three Ninth Circuit cases. While all three cases acknowledge the general rule that a claim for breach of fiduciary duty is derivative in nature, two of the cases appear to allow such a claim to be brought in directly.

In *Watson v. Button*, 235 F.2d 235 (9th Cir.1956) the court allowed an individual plaintiff to recover from the former general manager of a corporation for the misappropriation of corporate funds. Prior to bringing the action, all of the stock of the sale was sold to third parties. In connection with the sale, the general manager secured an agreement from the purchasers to release and discharge him from any claims existing against him in favor of the corporation. In allowing the plaintiff's recovery, the court noted:

Appellant and appellee were the only stockholders at the time of the misappropriation. The corporate creditors are adequately protected since appellant and appellee are jointly responsible for the

corporate liabilities. It is doubtful, in any event, whether under Oregon law the creditors could sue appellant for his misappropriation. The only right apparently would be to enforce the corporate cause of action, but that was given up by the present owners of the corporation when they purchased it from appellant and appellee.

The District Court did not err in concluding that the Oregon court would follow these decisions from other states which allow an individual recovery in this situation, at least in a case where the rights of creditors and other shareholders are not prejudiced. Suits against directors for violations of fiduciary duties are equitable in nature. It is unlikely that the Oregon courts would allow a director to misappropriate funds and leave those injured without a remedy.

*Id.* at 237.

In contrast, in *Lewis v. Chiles,* 719 F.2d at 1048, the court held that an individual plaintiff could not bring a direct claim for breach of fiduciary duty despite his claim that the officers and directors of the corporation sold the corporate assets as a means of insulating themselves from liability. The court held that in light of the fact that the shareholders approved the sale of assets with knowledge of plaintiff's claim and of the potential conflict of interest of officers and directors, the plaintiff could not bring his claim individually. *Id.*

Finally, in *Eagle v. American Tel. and Tel. Co.,* 769 F.2d 541 (9th Cir.1985) *cert. denied* 475 U.S. 1084, 106 S.Ct. 1465, 89 L.Ed.2d 721 (1986), the court "assumed" former shareholders could bring a direct claim against majority shareholders for breach of fiduciary duty because a corporate recovery "would not compensate the former minority shareholders for any loss they may have suffered as a result of the injury to" the corporation. The court's holding, however, must be tempered by the fact that the court was addressing a jurisdictional issue as opposed to the merits of the particular claim. Thus, the court did not address the relative merits of *Watson*

and *Lewis* and made only passing reference to the holding in *Watson.*

Having reviewed the above cases, I conclude that the present case is more akin to *Lewis* and does not present the factual basis which supported the *Watson* holding. In *Watson,* the court addressed the three factors which support derivative recovery as opposed to direct recovery. The court concluded that each factor was missing. 235 F.2d at 237. In the present case, I cannot reach the same conclusion.

The first factor favoring derivative recovery is that it avoids a multiplicity of suits. *Id.* The *Watson* court concluded that such a factor was lacking in that case because there were only two shareholders, the plaintiff and the defendant. In the present case, however, the potential of a multiplicity of suits exists. This conclusion is evidence by the existence of *Numrich v. Gleason,* Civ. No. 88–140–MA, and by the court's denial of class certification.

The second factor favoring derivative recovery is that it protects the corporate creditor. *Id.* Again, the *Watson* court concluded that such a factor was lacking in that case because the two shareholders were jointly liable for corporate liabilities. In the present case, there is no similar indemnity agreement.

Finally, the third factor favoring derivative recovery is that it protects all shareholders of the corporation since the corporation recovers the benefit. The *Watson* court disregarded this factor on the basis that the only two shareholders were parties to the case. In contrast, the present case does not involve all shareholders or even all former minority shareholders.

Based on the foregoing, I conclude that *Watson* is not controlling in this case and that the facts of this case dictate against the allowance of direct recovery for plaintiffs' claim of breach of fiduciary duty. Accordingly, defendant PTI's Rule 23.1 motion # 284, defendant AmNet's Rule 23.1 motion # 281 and defendant Price Waterhouse and Irving's Rule 23.1 motion # 295 are GRANTED.